IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID D., | ) |
| | ) |
|       Plaintiff, | ) |
| | )   No. 18 C 8530 |
|       v. | ) |
| | )   Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|       Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant David D. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied his application for a period of disability and Supplemental Security Income ("SSI") under the Social Security Act. 42 U.S.C. §§ 416(i), 402(e), and 423. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment [17] is granted.

**I. BACKGROUND**

    **A.    Procedural History**

On November 19, 2014, Claimant filed a disability application alleging a disability onset date of March 13, 2013. His claim was denied initially and upon reconsideration. On October 20, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on October 30, 2018, making the ALJ's decision

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to David D. as Claimant.

the Commissioner's final decision. 20 C.F.R. § 404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court on December 28, 2018.

### B. Medical Evidence

#### 1. Evidence From Claimant's Treatment History

Claimant was involved in a motor vehicle accident in June 2014 that resulted in neck, back, knee, and thigh pain. An MRI taken in July 2014 showed osteonecrosis of the left hip. (R. 246-47). Claimant underwent a variety of conservative treatments involving examinations by his family physician Dr. Umang Patel, who referred him to an orthopedic surgeon. On July 28, 2015, Claimant underwent a replacement of his left hip. (R. 474). He was treated with pain medication and referred to physical therapy. Despite the surgery, Claimant began complaining of renewed hip pain and back pain in December 2015. Claimant told Dr. Patel that the replacement "slips out of place" at times and caused pain that prevented him from sleeping. (R. 807). Dr. Patel prescribed Prednisone and anti-inflammatory medication. (R. 809-10).

Claimant also began to experience pain in his upper extremities. He complained of left wrist pain beginning in January 2014. Claimant described the pain to Dr. Patel as a "deep throbbing type, intense, [and] constant." (R. 524). Dr. Patel prescribed Norco to relieve his symptoms. Claimant then began experiencing pain in his right wrist that radiated upwards throughout the day. Dr. Patel diagnosed acute arthritis and prescribed Norco and an anti-inflammatory medication. (R. 500-501). In 2016, Claimant had pain in his neck and sought treatment from neurologist Dr. Rodrigo Ubilluz. A May 18, 2016 MRI of the cervical spine showed mild congenital spinal stenosis in the C2-C3 and C3-C4 areas with multilevel spinal and neural foraminal stenosis. (R. 789).

Claimant then underwent a nerve conduction study in July 2, 2016. Dr. Ubilluz noted that Claimant had been suffering "intense neck pain, back of both sides, 10 over 10," as well as headaches, that prevented him from lifting his arms. The pain radiated down from the neck into the arms. (R. 779). The study revealed demyelinating findings for the left ulnar sensory nerve and confirmed the MRI findings that suggested stenosis and a foraminal compromise that affected multiple nerve roots. (R. 783). Claimant complained of continued neck pain that radiated through both sets of fingers. Dr. Ubilluz prescribed the anti-inflammatory medication Etodolac and recommended that Claimant consult a pain management specialist. (R. 764).

### 2. Evidence From the State Agency Experts

On March 23, 2015, state agency expert Dr. Young-Ja Kim issued a report for the Social Security Administration. He determined that Claimant had a dysfunction of his major joints that constituted a severe impairment but that his peripheral neuropathy was non-severe in nature. (R. 58). Dr. Kim found that Claimant could lift 10 pounds both occasionally and frequently; could stand or walk for two hours a day; sit for six hours; had an unlimited ability to push or pull; and could occasionally kneel, climb stairs, and balance. (R. 58-60). Dr. Hemantha Surath found fewer restrictions on November 25, 2015. Dr. Surath added the severe impairment of reconstructive joint surgery but stated that Claimant could lift 20 pounds occasionally and stand or walk up to four hours a day. (R. 72). Contrary to Dr. Kim, however, Dr. Surath stated that Claimant had a limited ability to push or pull in his lower left extremities.

### 3. Evidence From Treating Physicians

On January 26, 2016, treating physician Dr. Patel issued a Chronic Pain Residual Functional Capacity questionnaire concerning Claimant's limitations. Dr. Patel stated that he had treated Claimant every three months since 2005. Emotional factors did not contribute to his

3

condition, but Dr. Patel believed that pain would frequently limit Claimant's ability to concentrate and pay attention. Claimant could only walk one block without pain and would not be able to tolerate even a low stress job. He could sit for only 30 minutes at a time before needing to stand and could stand for 15 minutes before needing to sit down. Claimant would not be able to sit, stand, or walk for more than two hours in an eight-hour workday. He would need to take unscheduled breaks every two to three hours for periods of 10 to 15 minutes each. Claimant's legs would need to be elevated at 30 degrees. Dr. Patel paid particular attention to Claimant's ability to use his upper extremities. He could rarely lift even less than 10 pounds at a time and could never lift 10 pounds or more. Claimant could only reach, grasp, turn objects, or carry out fine manipulation for 10 percent of the time bilaterally. (R. 757-59).

Treating neurologist Dr. Ubilluz also issued a report on May 23, 2017. The report consisted of brief answers to questions indicating that Claimant would be unable to stand more than six hours a day, that he would be absent two or more times each month, and that his symptoms would only allow him to concentrate or pay attention for more than 80 percent during a normal workday. (R. 796-98).

####     4.     Evidence From Claimant's Testimony

Claimant appeared at an administrative hearing on June 13, 2017 and described his symptoms to the ALJ. Claimant testified that he could only walk 10 to 20 feet without having pain in his hip and spine. He can only stand for five minutes and sit for 10 to 15. (R. 34). Claimant stated that he could climb stairs but often had difficulty in bending, stooping, crouching, and crawling. He also experienced problems in reaching overhead or straight ahead due to shoulder pain. (R. 35-36). He does few household chores. Claimant told the ALJ that he does not sweep, make the bed, take out the garbage, though he is able to mow the lawn once a

4

month. (R. 37). His wife takes the children to the doctor. (R. 38). Claimant described his social life as equally restricted. He does not eat out, has no hobbies, and only checks his email once every two months. (R. 39).

### C. The ALJ's Decision

The ALJ issued a decision on October 20, 2017 finding that Claimant was not disabled. Applying the five-step sequential evaluation that governs disability analyses, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of March 13, 2013. His severe impairments at Step 2 included a hip disorder, right upper extremity neuropathy, a spinal disorder, a left wrist disorder, and obesity. Headaches constituted a non-severe impairment. None of these impairments met or medically equaled a listing at Step 3. Before moving to Step 4, the ALJ concluded that the record did "not generally support" the severity of the symptoms that Claimant described. She also assigned weights to the medical expert reports. The ALJ assigned "some" weight to the state agency reports but found that subsequent evidence showed that Claimant was more restricted than these experts had concluded. She assigned "no" weight to Dr. Patel's report and "little" weight to Dr. Ubilluz's.

Based on these findings, the ALJ found that Claimant could carry out sedentary work as that exertional category is described in 20 C.F.R. Sec. 404.1567(a) as long as the following restrictions were added:

> he can never climb ladders, ropes or scaffolding and no more than occasionally climb ramps and stairs. He can no more than occasionally balance, stoop, crouch, kneel, crawl, bend or twist. He is to be provided a sit-stand option allowing [him] to stand 1-2 minutes after sitting 30 minutes. The claimant can use his left lower extremity no more than occasionally to push or pull and operate foot controls. He can reach in all directions no more than frequently with the upper extremities. He can use the hands no more than frequently to handle, finger and feel. The claimant should avoid concentrated exposure to work hazards such as unprotected heights and dangerous moving machinery. Finally, he is to be allowed to use a cane as needed to get to and from the workstation.

5

The ALJ determined at Step 4 that this residual functional capacity would prevent Claimant from performing his past relevant work as a laborer in a store. Based on the testimony of a vocational expert ("VE"), however, the ALJ found that work was available in the national economy for a person with Claimant's RFC. The ALJ therefore found at Step 5 that Claimant was not disabled. (R. 10-21).

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis

concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake their past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of their RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a

claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### III. DISCUSSION

Claimant argues that the ALJ erred by (1) improperly weighing the reports of Claimant's treating physicians and (2) failing to adequately state how the record supports the RFC.

#### A. The ALJ Improperly Weighed Dr. Patel's Report

An ALJ must assign specific weights to the reports of medical experts. *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006). A treating physician's opinion that "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other substantial evidence contained in the record is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *Meuser v. Colvin,* 838 F.3d 905, 912 (7th Cir. 2016). If the ALJ decides not to assign controlling weight to the treating physician's opinion, then she must explain why by addressing the factors outlined in 20 C.F.R. § 404.1527(c)(2) for claims – like the one here – that were filed prior to March 27, 2017. *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018). The Act explicitly states that the ALJ must discuss "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 750–51 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(c)(2)(i-ii)). The Seventh Circuit has repeatedly held that the failure to address the regulatory factors when discounting a treating physician's opinion is reversible error requiring remand. *Scrogham v.*

*Colvin*, 765 F.3d 685, 698 (7th Cir. 2014); *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011); *Campbell v. Astrue,* 627 F.3d 299, 308-09 (7th Cir. 2010); *see also Cullinan v. Berryhill,* 878 F.3d 598, 605 (7th Cir. 2017) ("An inadequate evaluation of a treating physician's opinion requires remand").

The ALJ did not consider any of these pertinent factors in deciding to reject Dr. Patel's expert report. She failed to note, for instance, that Dr. Patel began his report by stating that he had treated Claimant every three months since 2005. (R. 757). That made Dr. Patel far more familiar with Claimant's condition than any other medical source. The ALJ's failure to explain why Dr. Patel's personal knowledge of Claimant's condition did not merit greater weight is particularly concerning because she gave greater weight to the reports of the state agency physicians who never examined Claimant. "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing 20 C.F.R. Sec. 404.1527(d)(2)). When a specialized physician has treated a claimant for an extended period, it is difficult to understand how an ALJ can give greater weight to a non-examining expert without at least acknowledging the treating source's superior knowledge of the claimant's condition. *See Lannon v. Comm. of Soc. Sec.*, 234 F.Supp.3d 951, 956 (D.Ariz. 2017) (stating that a "longtime treating relationship provides a unique perspective on [the claimant's] condition, and the nature and extent of the relationship adds significant weight to" a doctor's opinion) (internal quotes and citation omitted); *Lawson v. Astrue*, 695 F.Supp.2d 729, 736 (S.D.Ohio 2010) (finding that a doctor's 20-year "relationship with [the claimant] provides a sound basis to credit his conclusions in lieu of" a non-examining source's report).

The ALJ's only reason for rejecting this report was that Dr. Patel did not explain the limitations that she said applied to Claimant and did not refer to any medical records to support them. The regulations state that a medical opinion is given greater weight when it presents "relevant evidence" such as laboratory findings to support the expert's conclusions. 20 C.F.R. § 404.1527(c)(3). Treating physician reports, however, frequently rely on the doctor's personal knowledge of the claimant's condition, the tests that the doctor previously ordered, and the diagnoses that were made. While it is true that Dr. Patel did not cite specific evidence in her report, Claimant points out that her treatment records show serious diagnoses and findings such as an ulnar neuropathy of the right elbow, cervical radiculopathy, paravertebral muscle tenderness, pain upon passive and active flexion of the left thigh, and wrist arthritis. (R. 331-32, 336, 338, 400-403, 500-501, 512). The ALJ was obligated to consider the degree to which Dr. Patel's findings were consistent with what the record reflects about her expert knowledge of Claimant's conditions. The ALJ did not do so, and the Commissioner has not responded to any of Claimant's arguments on these issues. The Court does not discuss the matter further, therefore, because the Commissioner's decision not to address the matter waives the issue. *See, e.g., Kelly v. Colvin,* No. 14 C 1086, 2015 WL 4730119, at *5 (N.D.Ill. Aug. 10, 2015) ("The Court does not address the second and third of these factors because the Commissioner does not defend the ALJ's assessment on these grounds . . . [and] [t]hat waives the ALJ's reliance on these factors"); *Herrmann v. Berryhill,* No. 1:17-CV-56, 2017 WL 6523931, at *13 (N.D.Ind. Dec. 20, 2017) (citing numerous cases for the proposition that the Commissioner's failure to address one of claimant's arguments amounts to waiver); *see also Cincinnati Ins. Co. v. E. Atl. Ins. Co.,* 260 F.3d 742, 747 (7th Cir. 2001).

The ALJ also discounted Dr. Ubilluz's report without considering that he was Claimant's treating neurologist. The ALJ stated that Dr. Ubilluz's notes did not show that Claimant would be unable to work and that the neurologist "just noted the claimant needed pain management." (R. 19). Neither the ALJ nor the Commissioner has explained how such statements adequately support the ALJ's finding. Merely stating that the record does not show that a claimant cannot work is a conclusion – not an argument – that fails to build any bridge between the record and the ALJ's finding. *See Brown v. Barnhart*, 298 F.Supp.2d 773, 788 (E.D.Wis. 2004) ("Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always give good reasons for her decision.") (internal quotes and citation omitted). Dr. Ubilluz's notes show that Claimant complained of "intense" pain and that he suffered from demyelination of the left ulnar nerve and congenital spinal stenosis. (R. 779). Instead of explaining why these findings did not support Dr. Ubilluz's report, the ALJ dismissed it by stating that the neurologist "just" recommended pain management. That fails to consider the intensity, frequency, or possible limitations of Claimant's pain.

The ALJ's primary reasoning, however, involved the form that Dr. Ubilluz utilized to make his report. She stated:

> Moreover, it should be noted that [the report] is based on [an] attorney-generated form, which is not couched in the language of our rules and regulations and not in the form of medical terminology. In particular, the assessment regarding the claimant's ability to make occupational adjustments and performance adjustments are based on a vocational analysis opposed to a medical analysis. If a doctor answers a question based upon a form that is not couched in our rules and regulations, he is often answering questions beyond his expertise. The possibility also exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. While it is difficult to confirm such motives, it is more likely where the opinions in questions [sic] departs [sic] substantially from the evidence of record, as in the current claim.

(R. 19-20).

11

The Court is unable to follow the basis of the ALJ's reasoning on these issues. Nothing in the regulations requires a treating source opinion to reflect the terms used in the SSA's rules and regulations. "On the contrary, they expressly contemplate that medical sources 'may' – but need not – use terms similar to those used in the regulations and may – but need not – use them in exactly the same way as the Administration if they do so." *Schink v. Comm. of Soc. Sec.*, 935 F.3d 1245, 1261 (11th Cir. 2019); *Pyles v. Comm'r of Soc. Sec.,* No. 1:19-CV-00634, 2020 WL 1493734, at *3 n.36 (N.D.Ohio Mar. 27, 2020) ("There is no requirement that a physician use the terms of the regulation in an opinion, and if other terms ae employed to describe a claimant's limitations, it is the ALJ who must look to the merits of the physician's opinion and render it in terms of the regulations.").

The Court recognizes that the form of a treating source opinion can raise concerns when the expert merely responds "yes" or "no" to questions pre-typed by the claimant's counsel. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). That is the case to some degree for Dr. Ubilluz's report, which contains one "yes" response to the question of whether Claimant would have a 20 percent deficit in concentration and attention. (R. 798). Even then, however, the form an opinion takes is only one factor in deciding the appropriate weight to give to a treating source. *See Fischer v. Barnhart*, 256 F.Supp.2d 901, 908 (E.D.Wis. 2002). The more important issue is the degree to which the record supports the expert's findings. *Id*. The ALJ stated in broad terms that Dr. Ubilluz's answers departed from the record but made no attempt to connect any part of the evidence to any of Dr. Ubilluz's conclusions. The Commissioner also cites nothing in the record that contradicts Dr. Ubilluz's report; instead, the Commissioner quotes several case authorities for the proposition that an expert report may be discounted when it is based on a claimant's subjective complaints. The ALJ never raised that issue, however, and

12

the Commissioner is prohibited from defending her evaluation of Dr. Ubilluz's opinion on that ground. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he Chenery doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).

The ALJ also suggested that the form of Dr. Ubilluz's report implied that he might have been overly sympathetic to Claimant. However, "there is no presumption of bias in a treating physician's disability opinion." *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993); *Mark J. v. Saul,* No. 18 C 8479, 2020 WL 374676, at *8 (N.D.Ill. Jan. 23, 2020) (same). Instead, an "ALJ must have a substantial evidentiary basis for finding a bias by the treating physician, and an otherwise medically valid opinion will not be ignored merely because of speculation that the physician was sympathetic to the claimant." *Goyco v. Colvin*, 13 C 6328, 2014 WL 5152570, at *5 (N.D.Ill. Oct. 14, 2014) (citing *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009)) (internal quotes omitted). Moreover, the report anticipated the ALJ's criticism by asking Dr. Ubilluz how he would respond to a suggestion that he had rendered a sympathetic opinion; he answered that "our relation[ship] is professional." (R. 799). The ALJ had no ground for disputing that response – which she overlooked – without explaining what it was in the record that refuted what Dr. Ubilluz stated in his report.

      **B.**    **The ALJ Should Restate the Reasons for the RFC**

Since this case already requires remand, the Court only briefly addresses the ALJ's reasons for the RFC assessment. SSR 96-8p requires an ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[.]" 1996 WL 374184, at *6. An ALJ has an affirmative duty to explain why the evidence supported the ALJ's own RFC

assessment. Even if the record arguably supports the RFC, remand is still required when an ALJ fails to carry out that obligation. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these [RFC] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

The ALJ did not comply with this requirement in deciding the kind of work that Claimant could perform. The ALJ stated, for example, that Claimant could frequently reach in all directions, finger, handle, and feel. (R. 14). The VE testified that a person like Claimant who was limited to a sedentary exertional level would not be able to work if he could only perform these activities occasionally.[2] (R. 48). Despite the critical nature of this finding, the ALJ made no attempt to explain how she determined that Claimant could frequently reach and handle objects. Instead of addressing this issue, the Commissioner claims – twice – that the ALJ reasonably weighed the medical opinions to find that Claimant could perform a range of *light* work. (Dckt. # 24 at p. 4). The ALJ assessed a range of *sedentary* work, however, and the Commissioner has provided no argument supporting the specific findings that the ALJ made.

The ALJ carefully reviewed the medical evidence concerning Claimant's tests, diagnoses, and medications. That fails to provide the necessary logical bridge, however, because an evidentiary summary is not sufficient when, as here, it leaves a court wondering how the ALJ derived his conclusions from the medical data. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018) ("Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain

---

[2] "Occasionally means from very little up to one-third of the time, and frequently means from one-third to two-thirds of the time." *Zenka v. Astrue*, 904 F.Supp.2d 884, 9900 (N.D.Ill. 2012) (internal quotes and citation omitted).

14

the basis of [his findings]."); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015). An adequate narrative explanation was crucial in this case because the ALJ did not accept any of the medical expert reports. It was therefore incumbent on the ALJ to address in at least minimal form why Claimant would be able to stand for up to two hours a day and sit for at least six hours if he were offered the sit-stand option provided in the RFC. As it stands, however, the ALJ did not address either of these issues or tie any medical record to her RFC conclusion about Claimant's ability to sit, stand, or walk. That requires remand so that the ALJ can build a logical bridge between the record and her conclusion.

## IV. CONCLUSION

For these reasons, Claimant's motion for summary judgment [17] is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall restate (1) the reasons for the weights given to the reports of Dr. Patel and Dr. Ubilluz and (2) the reasons that support the RFC assessment.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: May 12, 2020**